**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | |
|---|---|
| INTERCO TRADING, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NAVIGATORS INSURANCE COMPANY ) <br> d/b/a Navigators Specialty Insurance Company, ) <br> ) <br> **Serve :** ) <br> ) <br> **Robert H. Muriel** ) <br> **Illinois Director of Insurance** ) <br> **122 S. Michigan Ave., 19th Floor** ) <br> **Chicago, IL 60603** ) <br> ) <br> Defendant. ) | Case no. 3:21-cv-203 |

**COMPLAINT**

COMES NOW Plaintiff Interco Trading, Inc., by and through its undersigned counsel, and for its Complaint against Defendant Navigators Specialty Insurance Company., states to the Court as follows:

**THE PARTIES**

1.  Plaintiff Interco Trading, Inc. ("Interco") is a Missouri corporation with its principal place of business in Madison, Illinois.

2.  Defendant Navigators Specialty Insurance Company is a New York corporation with its principal place of business in New York City, New York.

**JURISDICTION**

3.  The relief sought by Plaintiff herein exceeds $75,000.

4.  Plaintiff and Defendant are of diverse citizenship.

5.  Defendant has agreed by contract with Plaintiff to submit to a court of competent

1

jurisdiction.

6. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332.

## VENUE

7. Plaintiff's principal place of business is located in this judicial district.

8. Plaintiff's cause of action accrued in and the debt sued upon arose in this judicial district.

9. Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b)(1) and (2).

## BACKGROUND

10. Plaintiff Interco operates a metal and electronics recycling facility at 10 Fox Industrial Park in Madison, Illinois ("Premises").

11. Defendant is a New York insurance corporation authorized to do an insurance business in Illinois and doing business in Madison, Illinois.

12. This complaint arises from the Commercial Lines Environmental Insurance Policy number NY17ESP0BGT08NC issued by Defendant to Plaintiff effective from June 1, 2017 through June 1, 2020 ("Policy"). Exhibit A hereto is a copy of the Policy.

13. The purpose of the Policy is to insure Interco against pollution events it may experience on the Premises.

14. In the early morning hours of March 11, 2020 ("Loss Date"), a building on the Premises owned by Interco caught fire.

15. Stored inside the building at the time of the fire was various metals and electronics products.

16. Smoke from the fire could not only be seen, but also smelled in downtown St. Louis, Missouri all day on March 11, 2020.

17. On the morning of March 11, 2020, Interco alerted Defendant Navigators that it

had experienced a fire on the Premises and that it would have a claim under the Policy.

18. The March 11, 2020 fire was a Pollution Incident, as that term is defined in Section V(S) of the Policy.

19. By the early afternoon of March 11, 2020, representatives from the Illinois EPA were on the Premises demanding Interco engage an environmental remediation contractor to perform environmental testing of the air, water and soil on the Premises and begin formulating a remediation plan to clean up the site.

20. In response thereto, on March 11, 2020, Interco engaged the services of O6 Environmental Services ("O6") to perform waste containment and a cleanup of the Premises, including testing of the Premises, securing and disposing of the water used to extinguish the fire and disposing of the debris remaining on the Premises that resulted from the fire.

21. O6's principal is an Environmental Professional as that term is defined in Section V(G) of the Policy.

22. Interco also engaged the services of St. Louis based law firm of Thompson Coburn, LLP ("Thompson Coburn") to provide legal representation with regard to pollution and environmental issues which may arise from the fire.

23. Thompson Coburn has been addressing environmental issues arising from the fire since the Loss Date.

24. Subsequent to the fire, the Illinois Environmental Protection Agency ("IEPA") cited Interco for violations of the Clean Air Act and Clean Water Act arising from the March 11, 2020 fire and has demanded cleanup of the site to remediate the alleged violations.

25. Interco promptly notified Navigators of the citations by the IEPA and provided copies of the Notices of Violation to Navigators.

26. Interco notified Navigators that it was hiring Thompson Coburn on or about

March 11, 2020. Navigators consented to pay an hourly rate significantly below the rates customarily charged by Thompson Coburn for the representation.

27. Interco notified Navigators that it was hiring O6 on or about March 11, 2020. Navigators consented to the engagement of O6, subject to later review of invoices for reasonableness.

28. On May 28, 2020, counsel for Interco advised Navigators that IEPA was requiring Interco to respond to pollution on the site by entering into a Remedial Action Compliance Plan pursuant to Illinois environmental regulations.

29. In response thereto, Navigators *recommended* Interco hire AECOM as an environmental consultant to assist in the preparation of such a report.

30. Interco hired AECOM as an environmental consultant for purposes of interfacing with the IEPA and assisting with the Remedial Action Compliance Report.

31. Navigators has made payments for invoices submitted by AECOM.

32. AECOM's agent assigned to this matter is an Environmental Professional as that term is defined in the Policy.

33. Section I(A)(1) of the Policy provides:

> **We** will pay on behalf of the insured **cleanup costs** resulting from a **pollution incident** located:
>
> a. at, on or under an **insured site**; or
> b. beyond the legal boundaries of an **insured site** if the **pollution incident** emanated from an **insured site**, provided
>
> **you** discover the **pollution incident** during the **policy period**, and report the **pollution incident** to **us** in writing as soon a practicable following discovery, and, in any event, during the **policy period**.

34. Section V(D) of the Policy defines "cleanup costs" to mean:

**D. Cleanup costs** means those reasonable and necessary expenses incurred in order to investigate, test, monitor, abate, remove, remediate, neutralize, clean or dispose of soil, groundwater, surfacewater, or other contamination arising from a **pollution incident** to the extent:

1. **Required by Environmental Law(s)** - an insured is required by Federal, State, Provincial, or local law(s), including, but not limited to, statutes, rules, regulations, ordinances, guidance documents, governmental, judicial, or administrative orders or directives, or state voluntary cleanup or risk-based corrective action guidance applicable to the **pollution incident**; or,

in the absence of environmental laws referenced in subparagraph 1. above,

2. **Recommended by an Environmental Professional** - recommended in writing by an **Environmental Professional** as necessary for the protection of human health and the environment.

**Cleanup costs** also includes reasonable and necessary expenses incurred by an insured with **our** written consent, to repair, replace, or restore real or personal property to substantially the same condition it was in prior to being damaged in the course of incurring **cleanup costs**, however, such expenses will not include any costs associated with any improvements or betterments. Further, with respect to a **pollution incident** at, on or under an **insured site**, the allowable costs to repair, replace, or restore real or personal property as noted will not exceed the actual cash value of the real or personal property immediately prior to incurring any **cleanup costs**.

35. The services performed by O6 on March 11, 2020 and the days immediately thereafter resulted in Cleanup Costs, as that term is defined in section V(D) of the Policy.

36. O6 also submitted a proposal for cleanup of the site to Interco and Navigators, which constitutes Cleanup Costs as that term is defined in Section V(D) of the Policy.

37. The Cleanup Costs outlined by O6 are both Required by Environmental Laws, as that term is defined in Section V(D)(1) of the Policy and Recommended by an Environmental Professional, as that term is defined in Section V(D)(2) of the Policy.

38. Within Section I, Coverage A(1)(a), Defendant agreed to pay "cleanup costs resulting from a pollution incident located at, or under an insured site" provided Interco discovers the pollution incident and reports it to Defendant in writing within the policy period.

39. The limit of insurance for the Policy is five million dollars ($5,000,000.00) with a deductible of twenty-five thousand dollars ($25,000.00).

40. On or about March 30, 2020, O6 submitted its invoice 3226 in the amount of $204,868.03 for cleanup costs to Navigators incurred during the period March 11, 2020 through March 30, 2020.

41. Navigators provided the invoice to its third-party consultant, Vertex, to determine

the reasonableness of same.

42. Upon information and belief, Vertex has opined all of the charges reflected on invoice 3226 are reasonable.

43. However, despite being reasonable charges and after sitting on the invoices for forty (40) days, on May 20, 2020, Navigators advised Interco in writing it declined to pay $68,206.25 of invoice 3226 because those sums are charged for what Navigators considers "non-remedial activities".

44. Specifically, the "non-remedial activities" consist solely of the time spent by O6 to meticulously segregate hazardous fire debris from non-hazardous fire debris.

45. The same is true with regard to O6's invoice 3260, which was issued by 06 to Navigators on April 19, 2020 for services rendered between March 30, 2020 and April 17, 2020.

46. Invoice 3260 was issued in the amount of $209,016.06.

47. Upon information and belief, Vertex has opined all of the charges reflected on invoice 3260 are reasonable.

48. After sitting on the invoice since April 19, 2020, Navigators advised Interco in writing on May 20, 2020 it declined to pay $182,170.39, or 87% of the invoice. The explanation given is the charges related to material segregation are "non-remedial activities" and, therefore, not covered under the Policy.

49. This scenario played itself out once again with respect to O6 invoice 3330 dated May 17, 2020 for services rendered between April 20, 2020 and May 15, 2020 in the amount of $529,549.82.

50. Upon information and belief, Vertex has opined all of the charges reflected on invoice 3330 are reasonable.

51. After sitting on the invoice since May 15, 2020, Navigators advised Interco in

writing on June 18, 2020 it declined to pay $332,482.97. The explanation given is the charges related to material segregation are "non-remedial activities" and, therefore, not covered under the Policy.

52. This scenario played itself out once again with respect to O6 invoice 3389 dated June 18, 2020 for services rendered between May 18, 2020 and June 10, 2020 in the amount of $224,983.90.

53. Upon information and belief, Vertex has opined all of the charges reflected on invoice 3389 are reasonable.

54. After sitting on the invoice since June 18, 2020, Navigators advised Interco in writing on August 12, 2020 it declined to pay $200,972.56. The explanation given is the charges are "not related to the remediation of the subject loss" and, therefore, is disputed under the Policy.

55. This scenario played itself out once again with respect to O6 invoice 3422 dated July 12, 2020 for services rendered between June 11, 2020 and July 2, 2020 in the amount of $238,646.80.

56. Upon information and belief, Vertex has opined all of the charges reflected on invoice 3422 are reasonable.

57. After sitting on the invoice since July 12, 2020, Navigators advised Interco in writing on August 12, 2020 it declined to pay $212,220.29. The explanation given is the charges "are not related to the remediation of the subject loss" and, therefore, disputed under the Policy.

58. This scenario played itself out once again with respect to O6 invoice 3498 dated September 17, 2020 for services rendered between July 6, 2020 and September 17, 2020 in the amount of $228,672.97.

59. Upon information and belief, O6 tendered this invoice directly to Defendant's

7

agent, Vertex.

60. Defendant claims it did not receive the invoice. Accordingly, Interco's counsel tendered the invoice to Defendant on November 11, 2020.

61. Upon information and belief, Vertex has opined all of the charges reflected on invoice 3498 are reasonable.

62. After sitting on the invoice since at least November 11, 2020, Navigators advised Interco in writing on January 14, 2021 it declined to pay $174,485.27. Of that disputed amount, Navigators alleged $136,731.27 was for segregation of building materials and $37,754.00 was for segregating battery cell and drum materials.

63. Within the same January 14, 2021 letter, Navigators stated it would pay $37,754.00 for the battery cell and drum material segregation and disposal as a "compromise". Interco accepted those funds without waiving the right to seek the remaining $136,731.27 disputed by Navigators.

64. The material segregation issue is of critical importance to both parties in this matter. It is undisputed there was a pollution event within the meaning of the Policy. That is, after all, why Navigators has made payments to O6 for the undisputed amounts and other vendors in full.

65. The reason the material needs to be segregated is it is substantially more expensive to dispose of hazardous waste than non-hazardous waste. The facilities that will accept hazardous waste for disposal are limited and have more regulations with which to comply concerning how the hazardous material may be disposed. As such, the premium for disposing of hazardous waste is significant.

66. None of the material and debris to be disposed of from Interco was hazardous before the fire.

67. But for the pollution event, there would be no reason to segregate material between hazardous and non-hazardous because it is the chemical and physical reactions resultant from fire itself that caused the material to become hazardous.

68. As such, the segregation is a direct and proximate result of the pollution event.

69. Moreover, Navigators has taken the illogical position that it should pay for segregation of some materials and not others, as if it is possible to segregate segregation.

70. Plaintiff obtained estimates for disposing of all (unsegregated) debris from the Premises as hazardous and provided same to Navigators on June 2, 2020. The cost estimate was $19,224,000.

71. By email dated June 4, 2020, Navigators' agent advised Interco that amount is not "cost effective".

72. It is obvious to Interco that a disposal fee of $19,224,000 is not cost effective and, as such, there is no choice but to segregate the debris into hazardous and non-hazardous for purposes of disposal.

73. Moreover, Interco acknowledges the Policy imposes the obligation on Interco to mitigate damages under the policy. Material segregation is precisely the type of mitigation required.

74. Interco obtained bids to dispose of the segregated zinc baghouse dust and lead contaminated materials in the aggregate amount of $183,840.00 and provided same to Navigators on June 2, 2020.

75. By email dated June 4, 2020, Navigators' agent approved of this proposal and advised Interco that amount is "reasonable".

76. Similarly, Interco has provided Navigators with invoices for disposal of certain deactivated battery cells and primary lithium-ion battery cells along with freight charges relative

to same. The claim for battery disposal now stands at $319,355.50 with all of it unpaid and outstanding.

77. Despite this concession by Navigators that the charges are reasonable, Navigators has failed and refused to pay for all of the disposal of the baghouse dust, lead contaminated materials or any of the battery cells previously stored on the Interco cite.

78. That bid was only able to be obtained and accepted by Navigators as a result of the material segregation for which Navigators has refused to pay.

79. As of the filing of this Complaint, the material segregation process has been completed and remains unpaid by Navigators.

80. Counsel for Interco made demand upon Navigators for payment of all sums due and owing under the Policy.

81. On September 3, 2020, Navigators issued a coverage denial email refusing to pay claims, primarily for material segregation, in the amount of $757,027.30, but electing to make a partial payment of $239,024.97 for segregation, screening and loading of battery cells and drums. A true and correct copy of this email is affixed hereto as Exhibit B.

82. Navigators re-affirmed this position by email dated October 13, 2020 and letter dated January 14, 2021. A true and correct copy of the October 13, 2020 email is affixed hereto as Exhibit C. A true and correct copy of the January 14, 2021 letter is affixed hereto as Exhibit D.

83. Interco is obligated to pay O6 invoices if Navigators does not pay same.

84. O6's reasonable invoices, as of the date of the filing of the Complaint, total $1,867,181.36.

85. Navigators has made payments totaling $858,272.88 and committed to paying an additional $91,941.70, which has not been received as of the date of the filing of the Complaint.

86. Interco has made payments to O6 in the amount of $900,000 as of the time of filing of this Complaint.

87. The material segregation expense is a Cleanup Cost, which occurred as a result of the Pollution Incident at the Premises on the Loss Date and is a covered loss under the Policy.

88. Interco is the first named insured under the Policy.

89. The Premises is insured under the Policy.

90. Interco has complied with all conditions of the Policy.

91. Interco has made demand upon Navigators to honor its Policy.

92. As more fully set forth above, Navigators has refused to honor its Policy.

93. As a result of Navigators' refusal to honor the terms of its Policy, Interco has hired attorneys to assist in recovering all sums due and owing from Navigators.

94. Interco has been forced to incur attorneys' fees to collect the sums due and owing from Navigators.

95. In addition to Interco, Interco's insurance brokers JW Terrill and RT Specialty have expressed their opinions to Navigators in writing that the Policy, which the brokers procured for Interco, should provide coverage for the sums sought by Interco herein.

96. Navigators has refused to pay Interco for the loss and damage, effectively damaging Interco due to the mischaracterization of the actions of Interco, by and through O6 to segregate hazardous from non-hazardous material as not being remedial when, in truth and in fact, said material segregation was a significant money saving measure which directly related to remediation.

### COUNT 1 - BREACH OF CONTRACT

97. Plaintiff restates the allegations of paragraphs 1-96 hereof as if fully set forth.

98. The Policy of insurance attached as Exhibit A provides that Defendant is

responsible to a for the material segregation component of cleanup of the Premises.

99. Defendant has breached the policy of insurance by refusing to pay for the material segregation even though the damage is a covered loss under the Policy.

100. Defendant's actions are in bad faith and lack fair dealing for failing to pay for the covered loss.

101. Defendant has denied Plaintiff's claim for an improper reason.

102. Defendant has a duty of good faith and fair dealing to its insureds that it has breached.

WHEREFORE, Plaintiffs pray for judgment against defendant Navigators Insurance Company of America as follows:

1. Awarding compensatory damages in an amount in excess of $75,000.00;

2. Awarding attorney's fees in an amount to be proven in accordance with Section 155 of the Illinois Insurance Code.

3. Awarding additional damages as provided in Section 155 of the Illinois Insurance Code.

4. Awarding costs to Plaintiff; and

5. Awarding such other and further relief as the court may consider proper.

**COUNT 2 - ATTORNEY'S FEES AND ADDITIONAL DAMAGES**

103. Plaintiff restates the allegations of paragraphs 1-102 hereof as if fully set forth herein.

104. Defendant's refusal and delay adjusting Plaintiff's claim in accordance with the terms and conditions agreed upon or the express terms and conditions of the Policy it issued and its improper basis upon which it has failed to pay the loss complained of is unreasonable and vexatious. Defendant's actions are designed to deprive Plaintiff of the amounts properly due

under their agreement with Defendant unless Plaintiff sues.

105. Section 155 of the Illinois Insurance Code (215 ILCS 5/155) provides attorney's fees and additional damages.

WHEREFORE, Plaintiffs pray for judgment against defendant Travelers Casualty Insurance Company of America as follows:

1. Awarding compensatory damages in an amount in excess of $75,000.00;

2. Awarding attorney's fees in an amount to be proven in accordance with Section 155 of the Illinois Insurance Code.

3. Awarding additional damages as provided in Section 155 of the Illinois Insurance Code.

4. Awarding costs to Plaintiff; and

5. Awarding such other and further relief as the court may consider proper.

## COUNT 3 – QUANTUM MERUIT

106. Plaintiff incorporates by reference the allegations of paragraphs 1 - 96 set forth above.

107. This count is pled in the alternative to Counts 1 and 2.

108. Plaintiff provided material segregation services to Defendant per its duty to mitigate under the Policy and at Defendant's request.

109. Plaintiff provided waste transportation and disposal services for the disposal of batteries to Defendant pursuant to Plaintiff's duty to mitigate under the Policy and at Defendant's request.

110. Defendant accepted and appreciated the benefit of the services from Plaintiff.

111. By accepting the benefit of the segregation services from Plaintiff, Defendant is not obligated to pay the $5,000,000 limit of insurance of the Policy for debris removal insomuch

as the cost of same would be $19,224,000.

112.    The reasonable value of the unpaid services provided by Plaintiff is $1,008,928.48 as of the date of the filing of the Complaint.

113.    By accepting the benefit of the waste transportation and disposal services, Defendant is not obligated to pay the cost of same to Plaintiff or Plaintiff's contractors who provided those services.

114.    The reasonable value of the unpaid waste transportation and disposal services provided by Plaintiff is $319,335.50.

115.    Plaintiff has made demand upon Defendant for payment of the value of the services rendered.

116.    Under principles of equity, permitting Defendant to retain the benefit of the unpaid services without payment would be unjust.

WHEREFORE, Plaintiff prays for judgment against Defendant in the principal amount of $1,328,263.98, plus statutory interest and costs expended herein and for such other and further relief as the Court may deem just and proper under the circumstances.

## COUNT 4 – UNJUST ENRICHMENT

117.    Plaintiff incorporates by reference the allegations of paragraphs 1 - 96 set forth above.

118.    This count is pled in the alternative to Counts 1 and 2.

119.    Plaintiff's contractor, O6, provided material segregation and other services to Plaintiff at Defendant's request.

120.    Plaintiff provided waste transportation and disposal services to Defendant at Defendant's request.

121.    Plaintiff is obligated to pay 06 for the material segregation benefit to Defendant.

122. Plaintiff is obligated to pay for the waste transportation and disposal services provided to Defendant.

123. Defendant accepted and appreciated the benefit of the services from O6 and corresponding payment obligation of Interco to O6.

124. By accepting the benefits of the services from 06 and payment obligation from Interco, Defendant is not obligated to pay the $5,000,000 limit of insurance of the Policy for debris removal insomuch as the cost of same would be $19,224,000.

125. The reasonable value of the unpaid services provided by 06 and for which Plaintiff has either paid or remains obligated is $1,008,928.48 as of the date of the filing of the Complaint.

126. By accepting the benefit of the waste transportation and disposal services, Defendant is not obligated to pay the cost of same to Plaintiff's contractors who provided those services.

127. The reasonable value of the unpaid waste transportation and disposal services provided by Plaintiff is $319,335.50.

128. Plaintiff has made demand upon Defendant for payment of the value of the services rendered.

129. Under principles of equity, permitting Defendant to retain the benefit of the unpaid services and payment obligation of Interco without payment to Interco would be unjust.

WHEREFORE, Plaintiff prays for judgment against Defendant in the principal amount of $1,328,263.98, plus statutory interest and costs expended herein and for such other and further relief as the Court may deem just and proper under the circumstances.

KODNER WATKINS

By: __/s/ Albert S. Watkins_____

ALBERT S. WATKINS #6193779
MICHAEL D. SCHWADE, #6300811
Attorneys for Plaintiff
7733 Forsyth Blvd, Suite 600
St. Louis, Missouri 63105
(314) 727-9111
(314) 727-9110 Facsimile
E-mail: albertswatkins@kwklaw.net
        mschwade@kwklaw.net